before seeing the fog bank, the Milwaukee did not sound her whistle. If the required signals had been given, it is highly probable that the boats would have avoided the collision. Stopping their respective engines while running into each other was too late. I consider that both steamboats are in fault, for running at too high a rate of speed while the river was not clear of fog, and for not blowing their steam whistles every two minutes, as required by the rules.

Reference is made to a commissioner to ascertain the amounts to be decreed.

## Case No. 9,626.

### The MILWAUKEE.

[Brown, Adm. 313.] [1]

District Court, E. D. Michigan. June, 1871.

COLLISION — STEAMERS MEETING END ON—RULE OF SUPERVISING INSPECTORS—SPEED.

1. It is not enough that steamers navigating a narrow channel are in charge of officers whose general competency is unquestioned; they should have a pilot on board acquainted with the particular channel, and the want of such pilot is prima facie a fault.

2. The absence of a lookout is not material, if the officer of the deck is in full possession of all the information a lookout could give him in time to avoid a collision.

[Cited in The Kallisto, Case No. 7,600. Approved in The George Murray, 22 Fed. 122.]

3. Rule 1 of the supervising inspectors (1865) cannot be construed to authorize one steamer to dictate to another a departure from the rule prescribed by article 13. The rule, however, may be sustained as an authority for an ascending vessel to propose to a descending vessel to depart from the requirements of the article, and for the descending vessel to accept such proposition, and to make such a departure, when thus mutually agreed upon, binding and valid.

[Cited in U. S. v. Miller, 26 Fed. 97.]

4. It is incumbent upon the vessel claiming the protection of the rule and a departure from the statutory requirement to show: (1) That a proposition to depart from the statute was made by her by means of the signals prescribed by rule 1, and in due season for the other vessel to receive the proposition and act upon it with safety. (2) That the other vessel heard and understood the proposition thus made. (3) That the other vessel accepted the proposition.

[Approved in The Mary Shaw, 6 Fed. 923. Cited in The Garden City, 19 Fed. 533; The Frostburg, 25 Fed. 452. Approved in The Clarion, 27 Fed. 130. Cited in The John King, 1 C. C. A. 319, 49 Fed. 472.]

5. There is no general obligation upon vessels navigating rivers to keep to the right of the centre of the channel, and no such custom proven to exist upon St. Clair flats.

6. The testimony of the officers and crew of each vessel, as to the number of whistles blown upon their own vessel, is to be believed in preference to that of an equal number of witnesses upon the other vessel.

[Cited in The Cherokee, 15 Fed. 121.]

7. Risk of collision begins the moment the two vessels have approached so near that a collision might be brought about by any departure from the rules of navigation, and continues up to the moment when they have so far progressed that

no such result could ensue. Under such circumstances, vessels should adopt such a rate of speed as to be at all times under ready and complete control until the risk is passed.

[Cited in The Grand Republic, 16 Fed. 429.]

8. A steamer descending a channel 850 feet wide at 14½ miles an hour, and another ascending at 8½ miles, both condemned for too great speed under the circumstances.

9. Whether the relative duty of the steamships to slacken speed under article 16 (when they are approaching each other so as to involve risk of collision), attaches the same moment the duty to port attaches under article 13 (when they are meeting end on, or nearly end on, so as to involve risk of collision), considered and discussed.

[Cited in The Free State, Case No. 5,090; The Manitoba, Id. 9,029.]

The collision occurred at about 6 o'clock in the evening, on the 23d day of November, 1866, in the St. Clair river, just above the flats, and in what is known as the Southeast Reach of the South Pass of that river. The Lac la Belle was a steam propeller, and of large size, being about 1,200 tons burden, and was engaged in the Lake Superior trade; and at the time of the collision was bound down on a voyage from Lake Superior ports to Cleveland, in the state of Ohio. The Milwaukee was a sidewheel steamboat, of great strength and power, and was engaged in carrying freight and passengers across Lake Michigan, between the ports of Grand Haven, in the state of Michigan, and Milwaukee, in the state of Wisconsin. She had been to Detroit for repairs, and at the time of the collision was bound up on her return to Milwaukee. The Milwaukee hit the Lac la Belle on her port side, just abaft the fore-chains, at an angle of about 45 degrees from the stern, cutting her very nearly in two, and sinking her in about two minutes. The weather was fine, and it was a good night to see. This South Pass of the St. Clair river, above mentioned, is a crooked channel, although between the two bends constituting the "Reach" spoken of, and in which the collision occurred, the channel is nearly straight. The width of the channel, for some distance above and below the place of collision, varies from 450 feet above to 1,000 feet below, and within those limits there is always an ample depth of water for the largest vessels navigating the lakes. At the place of collision the navigable channel is about 850 feet wide, and the collision occurred within not to exceed 75 feet of the extreme northerly or American bank. The course of the river, from a considerable distance above the place of collision, is at first south southwest, and when it reaches a point a little over half a mile above the place of collision, it makes a sudden bend to the westward, which latter course it keeps until, at a point about half a mile below the place of collision, when it makes a sudden bend to about northwest. These two bends are from a mile to a mile and a quarter apart, and between them the chan-

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

nel is nearly straight, with a slight indentation or curve, however, in the north bank to the northward, at just about the point where the collision occurred. Approaching vessels in the day time, and their lights in a good night to see, are in plain sight of each other across the low and marshy lands and shoal water within these bends, and for a considerable distance both above and below the bends. The proofs showed that both vessels were keeping nearer the American channel bank (which was the port hand bank to the Milwaukee and the starboard hand bank to the Lac la Belle), than to the Canadian bank; that the Milwaukee turned the lower bend a little before the Lac la Belle turned the upper bend, but so nearly at the same time as to be practically simultaneous; that the lights of each vessel were first made from the other before either had turned the respective bends in the river, and, of course, the lights of the Lac la Belle then made from the Milwaukee were the green or starboard light and the white light, and the lights of the Milwaukee then made from the Lac la Belle were the red or port light and the white light; that when each so made the other's lights, they must have been about two miles apart, and when each turned the respective bends in the river, which, as we have seen, was nearly simultaneous, they were from a mile to a mile and a quarter apart, and were approaching each other at nearly or quite full speed—that of the Lac la Belle being about 14½ miles an hour, with the current (which at this point is 2½ miles an hour) added, and that of the Milwaukee being about 8½ miles an hour, with the current deducted, making the aggregate speed with which the two were approaching each other by the land about 23 miles an hour, or one mile in 2 minutes and 36 seconds; that these rates of speed were fully maintained by each until collision was inevitable, when the Milwaukee's engine was stopped and reversed, but not in time to produce any perceptible effect upon her speed before the collision occurred.

How the two vessels approached each other, what signals were given by each, and some other facts involved in the case, are stated in the opinion of the court.

The faults specifically charged in the libel against the Milwaukee were: 1. That she had no sufficient and competent officers and crew acquainted with the channel and navigation of the St. Clair river, and at their appropriate and proper places. 2. That they did not answer the signals of Lac la Belle and keep to the right hand side of the river, as both the law and good seamanship require; but, on the contrary, turned to the left, and attempted to pass to the left and to the westward of the said Lac la Belle, contrary to law and good seamanship. 3. Other faults, etc., unknown to libellants, but known to the officers and crew of the Milwaukee, which, when discovered, it was prayed might be inserted in the libel.

The faults specifically charged in the cross-libel against the Lac la Belle were, in the words of the libel: 1. "That said propeller was coming at full speed and showing her green and white lights, and as if to pass on the starboard hand side of the said steamboat. That while so running, and when the said propeller had approached quite close, suddenly she appeared to be swinging to starboard, as if under an order to port, and appeared to be attempting to pass across the bow, and on the port hand side of said steamboat, but on attempting to do so, she was made to run against and collide with the said steamboat Milwaukee." 2. "That although the master of the said steamboat had given his proper signals indicating which side he would pass, and had received an answer to said signal, and when the said propeller had commenced swinging to starboard, as aforesaid, and across the bows of the steamboat, the said master immediately stopped and backed his said steamboat, but so short was the distance between the said propeller and said steamboat, and so great was the speed of said propeller, that the said propeller came on and collided with the said steamboat as aforesaid."

The libellants against the Milwaukee laid their damages at the sum of $167,000, and the libellants against the Lac la Belle at the sum of $6,000.

John S. Newberry, George B. Hibbard, and Willey & Cary, for the Lac la Belle.

Alfred Russell and G. V. N. Lothrop, for the Milwaukee.

LONGYEAR, District Judge. The first charge of fault against the Milwaukee is, substantially, not that her officers and crew were generally incompetent, but that they were unacquainted with the channel and navigation of the particular waters in which the collision occurred, and that they were not at their proper places. As an independent or abstract proposition, I think it is clearly proven that the officers and crew of the Milwaukee had but very little experimental knowledge of that channel. And I think the proofs upon this point are such as to justify the court in holding that their knowledge in this respect was inadequate to the navigation of the difficult passes of the St. Clair river, especially in the night, and that such want of knowledge was sufficient, prima facie, to constitute a fault. Here was a large steamboat of great strength and power, to be navigated in the night time through a channel full of tortuous and narrow passages, difficult of navigation even in the day time, and requiring the highest degree of experimental as well as theoretical knowledge of those passages for safe navigation through them. When we add to this the fact that these difficult passages lie right in, and in fact constitute a part of the great highway of the entire commerce of the great

Northwestern Lakes, and are consequently literally filled with vessels passing and repassing, both night and day, Captain Trowel's attempt to take his vessel through, without an experienced pilot, however competent he may be to navigate the open waters, certainly seems like the very height of presumption, and was an act deserving a stern rebuke, if nothing more.

But the question, after all, is, was this want of knowledge on the part of the officers and crew of the Milwaukee the cause of, or did it contribute to the collision? The theory advanced on the part of the libellants against the Milwaukee is, that when the lights of the Lac la Belle were first made from the Milwaukee, Captain Trowel's want of knowledge of the bends in the river between the two vessels, the lights made being the green and white, led him to the conclusion that the Lac la Belle was crossing the Milwaukee's course, instead of meeting her, and that she would naturally pass to his starboard; and it was assumed that it was this misapprehension that resulted in the collision. The assumed fact upon which this theory is based is, that Captain Trowel did not know of the existence of the bends in the channel. If this fact were sustained by the proofs, or if it were left without direct proofs, to be inferred from Captain Trowel's general want of acquaintance with the channel, the theory might have some plausibility. But, unfortunately for the theory advanced, what proof there is as to that fact is decidedly the other way. In the first place, Captain Trowel swears substantially that he was aware of those bends, and in the next place he must of course have been made aware of the existence of them when the two vessels had turned them, which was in time, with correct management, to have avoided a collision; and finally, the signal given on board the Milwaukee, whether it was a single or a double blast of the whistle, was a signal given only when meeting, showing clearly that Captain Trowel understood at that time that they were meeting and not crossing. I think, therefore, that the theory advanced is rebutted by the facts proven. I shall have occasion, however, to allude to this subject again in connection with another branch of the case. The only charge made under the other division of the first charge of fault is that the Milwaukee had no lookout. It clearly appears, however, that the captain who was in charge of the navigation of the Milwaukee saw the Lac la Belle's lights and was in full possession of all the information that a lookout could have given him, in ample time to have avoided a collision. It is, therefore, immaterial to inquire into the fact whether there was a lookout or not. The second charge of fault against the Milwaukee is, substantially, that she did not keep to the right, but turned to the left, and that this was contrary to law and good seamanship.

The specific regulations, statutory and otherwise, involved in this charge of fault, are articles 13, 14 and 18 of the act of April 29, 1864 (13 Stat. 60, 61), which were then in force, and rule 1 of the rules adopted by the board of supervising inspectors, October 17th, 1865, also then in force, which articles and rule are as follows: "Art. 13. If two ships under steam are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other. Art. 14. If two ships under steam are crossing so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way of the other." "Art. 18. Where, by the above rules, one of two ships is to keep out of the way, the other shall keep her course," etc. "Rule 1. When steamers are approaching each other, the signal for passing shall be one sound of the steam whistle to keep to the right, and two sounds of the steam whistle to keep to the left. These signals to be made first by the ascending steamer. If the dangers of navigation, darkness of the night, narrowness of the channel, or any other cause, render it necessary for the descending boat to take the other side, she can do so by making the necessary signals, and the ascending boat must govern herself accordingly. These signals to be observed by all steamers, either day or night." The manoeuvring of the vessels which resulted in the collision commenced when each turned the respective bends in the river. This manoeuvring on the part of the Milwaukee, was a starboarding, and running in toward the American channel bank, and on the part of the Lac la Belle, a porting, and running in towards the same bank; so that, as has been before stated, the collision occurred within 75 feet of that bank, and that, too, in a channel which at that point was at least 850 feet wide, and at that time unobstructed. It seems incredible that vessels commanded by competent and intelligent officers should have thus collided in such a channel, and upon such a night. Surely, a grave responsibility rests somewhere, and I think we shall find it resulted in large part from a misapprehension, or at least a misapplication of the articles and rules above quoted.

It is contended on behalf of the Milwaukee that she gave the signals, viz.: two sounds of her steam whistle, prescribed by rule 1, for passing to the left, and that she was therefore right in passing to the left as she did. It is also contended that the Lac la Belle responded by two sounds of her steam whistle, and that, therefore, for a still stronger reason, the Milwaukee was entitled to do as she did.

On behalf of the Lac la Belle it is contended that rule 1 is in conflict with the articles of the statute above quoted, as applied to the facts of this case, and, therefore, affords no protection to the Milwaukee for starboarding and attempting to pass to the left as she did.

The fact that the Lac la Belle responded as alleged is also disputed and the contrary is contended. So far as the rule was in conflict with the act, it was undoubtedly of no effect; and it was so in conflict so far as it might be construed to authorize one vessel, whether ascending or descending, to dictate to the other a departure from any rule prescribed by the act. The rule may, however, be sustained (and I think this is the only effect that can be given to it), as an authority for an ascending vessel to propose to a descending vessel to depart from the requirements of the act, and for the descending vessel to accept such proposition, and to make such a departure when thus mutually agreed upon binding and valid. In such case, and no other, the rule was a protection to a steam vessel departing from a statutory requirement.

In this view of the subject the burden is upon the vessel claiming the protection of the rule and against any departure from the statutory requirement, to prove all the following facts: 1. That a proposition to depart from the statute was made by her by means of the signals prescribed by rule 1, and in due season for the other vessel to receive the proposition and act upon it with safety. 2. That the other vessel heard and understood the proposition thus made. 3. That the other vessel accepted the proposition.

And these facts must be made out by clear and satisfactory proofs. They must not be left to inference. The statute in question is one of vital importance for the protection of life and property upon the waters, and it will not do to hold a party blameless for a departure from its plain provisions, upon a plea of an agreement or license to do so, except where such agreement or license is admitted, or is made out beyond all reasonable doubt by clear and satisfactory proof. Where the agreement is denied, and the evidence is conflicting and contradictory, and does not clearly preponderate in favor of such agreement, the statute must govern, and the responsibility of parties must be determined accordingly. In this case it is all the same whether the vessels were approaching each other end on, or nearly end on, and so within article 13, or crossing, and so within article 14; for, in either case, the Milwaukee departed from the statutory requirements, to justify which she must prove an agreement authorizing her to do so. If they were meeting end on, or nearly end on, it was the statutory duty of both, under article 13, to port, which the Milwaukee did not do, but on the contrary, starboarded. If they were crossing, they were doing so on such courses that the Lac la Belle had the Milwaukee on her (the Lac la Belle's) starboard side, and under article 14 it was the statutory duty of the Lac la Belle to keep out of the way of the Milwaukee (which she had the right to do by taking either side of the latter), and under article 18 it was the statutory duty of the Milwaukee to keep her course, which she did not do, but starboarded.

I find, however, from the proofs that, as matter of fact, the two vessels were meeting end on, or nearly end on, within the meaning of article 13. That they were so meeting, and in such a manner as to involve risk of collision, is evident from the following considerations:

1. From the nearness of their respective courses to the American channel bank. Each vessel was keeping the American channel bank comparatively close aboard, and was running by it instead of by the compass. When the Milwaukee turned the lower bend, she was, by the estimates of those on watch on her at the time, about 200 feet from the shore, and circumstances seem to warrant that the estimate is very nearly correct. When the Lac la Belle turned the upper bend, she was, in the opinion of those on watch on board of her at the time, not beyond the center of the channel, but in fact between that and the American channel bank, and the circumstances seem to warrant that this estimate is also very nearly correct. As we have seen, the channel at this point was not to exceed 450 feet wide. At all events, it was not to exceed 500 feet so that, allowing the widest latitude, the Lac la Belle was not to exceed 250 feet from the American channel bank at this point. Between these two points (and as we have before seen, the two vessels were at these points at practically the same moment of time), the general courses of the two would be on straight lines, which lines, from the above data, could not be more than 50 feet apart, and might be, and probably were, less than that. The two vessels were then from a mile to a mile and a quarter distant from each other. By actual measurement it will be found that at this stage they could have varied but a very small fraction, not to exceed one-tenth of a point from dead ahead of each other. Even if we place the Lac la Belle within 100 feet of the extreme opposite bank, they would not vary more than one-third of a point from dead ahead. This is certainly as nearly end on as vessels usually approach each other. At all events, it is far within the definition which has been given by the courts of what is "end on or nearly end on," within the meaning of article 13. It can make no difference, in this connection, that the lights of the Lac la Belle, first seen from the Milwaukee, were the green and white lights only. This would necessarily be the case until the Lac la Belle had turned the upper bend. In determining how vessels are approaching each other in narrow, tortuous channels like the one here in question, their general course in the channel must alone be considered, and not the course they may be on by the compass at any particular time while pursuing the windings and turnings of the channel. It is too late, however, to claim that Trowel was misled, by any such appearance of the lights of the Lac la Belle, into the supposition that she was crossing the course of the

Milwaukee, because the signal he gave and the manoeuvres he made are both inconsistent with such supposition. If the Lac la Belle had been crossing the course of the Milwaukee, and Capt. Trowel had so understood, then any signal to turn to the right or to the left would have been uncalled for and unnecessary, and, of course, would not have been given; he would have simply kept his course as required by article 18.

It is proper, perhaps, to remark here that I do not subscribe to the doctrine advanced on behalf of the libellants against the Milwaukee, that vessels navigating rivers must, in all cases, when meeting, keep to the right of the center of the navigable channel. I know of no such law in this country, and there is no such custom in the navigation of the channel in question. Vessels navigating rivers in this country, like vehicles in a highway, may use any part of the channel they may see fit, observing, however, in all cases when meeting or passing other vessels, the ordinary rules of navigation.

2. That the two vessels were so meeting—end on, or nearly end on—so as to involve risk of collision, is clear from the evident understanding on the part of each at the time, else why the signals and the manoeuvres by each? If there was no risk of collision, there was certainly no necessity and no excuse for any signal by either to go to the right or to the left, nor for the Milwaukee's starboarding as she did, or the Lac la Belle's porting as she did. The fact that each gave a signal intended to be given only in case of risk of collision, and that each changed her course with intent to avoid a collision, makes it clear that in the judgment of each there was such risk. Articles 13, 14, and 18, and rule 1, have no operation except in case of risk of collision. But independently of this, the idea that there was no risk of a collision is fully exploded by the fact that there was a collision.

I find, therefore, as matter of fact, that the two vessels were meeting end on, or nearly end on, so as to involve risk of collision, and hence that the case falls primarily under article 13, which requires each to put her helm to port so as to pass on the port side of the other. The proofs show that the Lac la Belle did so put her helm to port, while the Milwaukee put hers to starboard, and that the collision was brought about solely by these joint manoeuvres. I have also found, as matter of law, as before stated, that the Milwaukee having thus departed from the statutory rule, she is prima facie in fault, and that the burden is upon her to show that an agreement was entered into under rule 1 for such departure, and that to this end it was necessary for her to prove: 1. That she gave the proper signal, viz., two blasts of her steam whistle, proposing such departure, and in due season; 2. That such signal was heard and understood; and 3. That the proposition was accepted by the Lac la Belle.

As to the first proposition, there is a conflict between the testimony of the officers and crew of the Lac la Belle and those of the Milwaukee, as to what signal was heard by the former, and what was actually given by the latter. The testimony of those on board the Milwaukee is all agreed that the signal actually given by her was two blasts, and from their better means of knowledge as to what was done on board their own vessel, under a well-known and recognized rule for weighing conflicting testimony in cases of this sort, it must be held as proven that two blasts of the whistle were given by the Milwaukee, and that they were given so as to indicate the desire and proposition on her part to depart from the statutory requirement of article 13, and to pass to the left, as provided in rule 1, instead of to the right, as provided by said article.

In the view I shall take of the two remaining propositions, which I shall now proceed to consider, it is unnecessary to discuss the question whether the signal so made by the Milwaukee was made in due season. In point of fact, the signal was given at about the time the two vessels turned the respective bends in the river, and, consequently, when they were a mile to a mile and a quarter, or, in point of time, two minutes and a half apart. This would, no doubt, be in season under ordinary circumstances, but in consideration of the speed of the Milwaukee—11 miles through the water, and eight and a half by the land—which, under the circumstances that it was in the night time and in a narrow and crooked channel, of which the officers and crew in charge had comparatively no practical knowledge, was, to say the least, extraordinary, and also in consideration of the further fact that the approaching steamer's lights had been in sight for some time previous, and that it must have been evident to those in charge of the navigation of the Milwaukee that the other vessel was so approaching, also at a high rate of speed, it might be contended with much plausibility that the Milwaukee's signal ought to have been given sooner than it was. But without deciding that point, I pass to the consideration of the two remaining propositions, viz.: Whether the Milwaukee's signal was heard and understood by the Lac la Belle, and whether the proposition thus made was accepted by her. In this connection it must be borne in mind that the burden was upon the Milwaukee to maintain both these propositions. In departing from the statutory regulations, she assumed the entire risk of her signal being heard and understood by the approaching vessel, and of herself hearing and understanding the reply. The St. John [Case No. 12,224]; The Atlas [Id. 633]; The Washington [Id. 17,220].

Here again the testimony of the officers and crews of the respective vessels, as to what was actually done upon the one and heard and understood upon the other, is in direct con-

flict the one with the other. We might stop right here, and say that the witnesses standing in the main on an equal footing as to credibility, and disagreeing as to the main facts, the propositions are not proved; that under the rule heretofore laid down, the proof taken as a whole is not of that clear and satisfactory character necessary to make out a justification for the Milwaukee's departure from the statutory requirement. But this is unnecessary. Applying the same rule as was applied above to the testimony of the officers and crew of the Milwaukee as to what signal was actually given on board of her, to the testimony of the officers and crew of the Lac la Belle, as to what signal was heard on board the latter, and what signal was given by her, the evidence is overwhelmingly preponderating that the signal of the Milwaukee was actually heard and understood on the Lac la Belle as one blast of the steam whistle, instead of two, and that the signals given by the Lac la Belle were signals of one blast only, although repeated, thus clearly showing that the signal of the Milwaukee was not correctly heard and understood by the Lac la Belle, and that the proposition of the former to depart from the statutory rule was not accepted by the latter.

It was contended, on behalf of the Milwaukee, that, her whistle being a very loud one, if she gave two sounds, two must have been heard on the Lac la Belle. This is an inference merely; of course it is not conclusive as against positive, unimpeached testimony as to what was in fact heard, although it might, and no doubt would, be controlling in the absence of such testimony. The proof shows that the signal of the Lac la Belle was repeated, and it was contended on behalf of the Milwaukee that the two sounds of the steam whistle thus given were given so nearly together in point of time as, in fact, to constitute but one signal of two sounds within the meaning of rule 1; or, at least, that the one followed the other so closely as to justify the Milwaukee in assuming, as she did, that they constituted but one signal, and as such indicated an acceptance by the Lac la Belle of the Milwaukee's proposition to go to the left. By the proofs there can be no doubt that the two sounds given by the Lac la Belle were intended for separate signals, each as a signal to adhere to the statutory rule, to keep to the right. Yet, if they were given in such a manner as, in fact, to constitute but one signal of two sounds, the Lac la Belle must be held to respond accordingly, regardless of her intentions. It is not sufficient that they were so near together as to create a doubt merely as to which was meant, because in that case the Milwaukee had different duties to perform under other rules (2d and 10th rules of October 17th, 1865), which duties there is no pretense of her having performed. The two sounds

meant by rule 1, as a signal, are well understood by all steam navigators, and in fact by all persons at all accustomed to hearing that signal given, to be two sounds in quick succession, constituting a sort of double sound or blast. The witnesses on the part of the Lac la Belle, the mate who gave the sounds, and a large number of the officers and crew who heard them, are fully agreed that the sounds were not of that double character. Estimates of time I place but little reliance upon. But we are not left to rely upon such estimates alone. Many of the witnesses tell us what they were doing, where they went, etc., between the two sounds, showing clearly that a considerable time must have elapsed, and amply sufficient to deprive the two sounds of the character claimed, and to show that the second sound was really such as was intended by the mate of the Lac la Belle then on watch, viz.: a repetition of the former signal of one sound to go to the right. This conclusion is strengthened by the testimony of Durling, the professional pilot of the St. Clair flats, who was listening to the sounds for a purpose connected with his professional employment, and who had no part or interest whatever in the affairs or navigation of either vessel.

I find therefore that the Milwaukee has failed to justify her departure from the statutory rule to port, and that therefore in this respect she was in fault.

I think the Milwaukee was also in fault in respect to her speed. Article 16 of the act of April 29, 1864 (13 Stat. 61), provides as follows: "Every steamship, when approaching another ship so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse," etc. This rule is but a re-enactment of what was the law before, and the law so re-enacted is but the embodiment of the dictates of common prudence. Under it a steam vessel is not permitted to approach another vessel, whether propelled by steam or otherwise, whether meeting or overtaking, so near that a collision is inevitable, or even dangerous, before taking the prescribed precaution. Risk of collision is sufficient to bring such steamer under the rule, and there is always risk of collision in case of vessels meeting or passing in a crooked and comparatively narrow channel like the one here under consideration. This the Milwaukee did not do, although she saw the Lac la Belle long before they came together. But, on the contrary, she was kept at quite or nearly her full speed up to but a moment before the collision, when her engine was stopped and reversed, but too late, and of course to no purpose. This excessive speed on the part of the Milwaukee was all the more reckless and inexcusable, and makes the fault all the graver and more reprehensible, for the reason that, as we have seen, her officers and crew were unacquainted with the channel, and for the further reason that such

speed was entirely unnecessary. She was going against the current, and nothing like her rate of speed was necessary for steerage way. It is, of course, impossible to lay down any precise rule as to just what rate of speed steam vessels shall adopt under such circumstances; but it is perfectly safe to say that they should adopt such a rate of speed as to be at all times under ready and complete control until the risk is fully passed, and this is certainly not the 11-knot speed of the Milwaukee, if we take it through the water, or her 8½-knot speed, if we take it by the land. But I shall notice this subject of speed further when considering the charge of excessive speed made against the Lac la Belle, which I shall now proceed to do.

The faults charged against the Lac la Belle, briefly stated, are substantially: 1. A sudden and unexpected change of course to starboard. This charge is fully disposed of in favor of the Lac la Belle in what has already been said. 2. Excessive speed. The speed of the Lac la Belle, as we have seen, was about twelve miles an hour through the water, and about fourteen and a half miles by the land. That of the Milwaukee was about eleven miles through the water and about eight and a half by the land. The Lac la Belle was moving with the current, and therefore not so readily controlled or so easily stopped as the Milwaukee, which was moving against the current. She was aware of the approach of the Milwaukee in ample time to have adopted the precautions dictated by article 16 above quoted, as well as by common prudence, by checking her speed so as to be under ready control. The same risk of collision, and the obligations thereby imposed, were upon her as were upon the Milwaukee. And yet we find her dashing down the current at nearly or quite her greatest rate of speed—a rate of speed, too, which is nearly, if not quite, equal to that of the fastest steamers navigating the Great Lakes, and keeping up that rate of speed with all the risk and danger fair before her, without check or diminution, up to the very moment of collision. If we may recognize degrees of fault in such cases, the fault of the Lac la Belle in this respect, notwithstanding the greater familiarity of her officers and crew with the channel, was even greater than that of the Milwaukee. It was claimed that the obligation to check did not attach to the Lac la Belle, because but for the mistake of the Milwaukee in starboarding when she ought to have ported, there was no danger of collision—that the Lac la Belle had a right to assume that the Milwaukee would obey the law, and if she had done so there would have been no collision, notwithstanding the excessive speed complained of. This doctrine, carried to its ultimate results, would avoid all rules having for their object the enforcement of precautionary measures for prevention of collisions, and would recognize the right of a vessel, herself technically obeying the rules, unnecessarily to

run another down, which, accidentally or otherwise, might come in her way in consequence of some non-observance of those rules, neither of which results would for a moment be recognized as law by the learned advocates who advanced the doctrine stated.

Conceding, however, all that is claimed, the Lac la Belle was still in fault for not slackening her speed. The moment the Milwaukee starboarded and showed her green light to the Lac la Belle, there was danger of collision. This occurred, as we have seen, when they were a mile or a mile and a quarter apart. It then, if not before, certainly became the duty of the Lac la Belle to slacken speed. I think, however, it is open to discussion under article 16 whether the obligation of a steamship approaching another vessel to slacken speed does not attach the moment risk of collision is involved, and whether, under that article, it is allowable for such ship to wait to see if there is absolutely danger of collision before doing so. Danger of collision is, of course, included in risk of collision, but it is not all there is of it. There is never danger of collision other than by inevitable or inscrutable accident, where all fully and completely obey the law. Danger of collision begins only when one vessel or the other begins to depart from the rules established by law. Risk of collision begins the very moment when the two vessels have approached so near each other and upon such courses, that by a departure from the rules of navigation, whether from want of good seamanship, accident, mistake, misapprehension of signals, or otherwise, a collision might be brought about. It is true, that, prima facie, each has a right to assume that the other will obey the law. But this does not justify either in shutting his eyes to what the other may actually do, or in omitting to do what he can to avoid an accident, made imminent by the acts of the other. I say the right above spoken of is prima facie merely, because it is well known that departures from the law not only may, but do, take place, and often. Risk of collision may be said to begin the moment the two vessels have approached so near that a collision might be brought about by any such departure, and continues up to the moment when they have so far progressed that no such result could ensue. The Nichols, 7 Wall [74 U. S.] 663. The language of article 13, prescribing the condition in this regard, in which the helm of each shall be put to port, and that of article 16, prescribing the conditions under which they shall slacken speed, is precisely the same "so as to involve risk of collision." From this it would seem to follow that the obligation to slacken speed attaches the moment the obligation to port attaches, and that the former obligation continues while the latter continues—or, in other words, that the obligation to slacken speed under article 16 always co-exists with the obligation to port under article 13. The doc-

trine here asserted is forcibly illustrated by the case now under consideration. No one will contend for a moment that Capt. Trowel, of the Milwaukee, intended to disobey the law, but, on the contrary, I think, all must concede that he intended to obey it. He evidently misconceived his legal rights, and probably misapprehended the signals of the Lac la Belle, which misconception and misapprehension, and his consequent starboarding instead of porting, as we have seen, was the primary cause of the collision. The Milwaukee is held in fault in this respect, not because Capt. Trowel's departure from the law was willful or intentional, but simply because it was unauthorized. Such misconception of law and misapprehension of fact are occurring upon the waters daily and nightly, and it is to them that the great bulk of collisions is to be attributed, and the risk of collisions from these causes constitutes by far the larger portion of the risks of navigation growing out of collisions; and, I think it may be assumed that when risk of collision is spoken of in the law, it includes this risk as one of its principal elements. But as we have already seen, it is not necessary to go to that extent in this case.

It cannot be successfully claimed on either side that the failure to slacken speed did not contribute to the collision. The aggregate of the speed of the two was about twenty-two miles an hour, or one mile in a little over two minutes and a half. If the speed of each had been slackened to even one-half what it was (and I think it ought to have been slackened more than that), each would have been afforded an opportunity to fully comprehend the mistake which had been made, and to provide against it. It is fair to presume that if this had been done we should not now be considering one of the most, if not the most calamitous and deplorable collisions ever recorded as happening upon the Great Lakes and their connecting waters.

I find, therefore, that the collision was caused primarily by the unauthorized departure of the Milwaukee from the statutory rule prescribed by article 13 of the act of 1864, requiring each vessel, in the situation in which the two then were, to put her helm to port so as to pass on the port side of the other, and that a contributing cause of the collision, and without which it is fair to presume it would not have occurred, notwithstanding such primary cause, was the gross and inexcusable failure on the part of each vessel, and more especially the Lac la Belle, to slacken speed as required by article 16. It results, therefore, both vessels being in fault, that there must be a division of damages.

The importance of this case not only to the parties immediately interested in respect to the amount involved in dollars and cents, but also to the interests of commerce and navigation in respect to the principles involved, has led me into a close and careful scrutiny and consideration of the facts in the case, and of the able and exhaustive arguments and briefs of the learned advocates on both sides, from which I have derived much aid in my investigations—such a scrutiny and consideration as those interests, both private and public, seemed to demand. I have been led also into a somewhat extended elucidation of my conclusions, thereby the more thoroughly to test their correctness, and also in order that if either party, or both, feeling aggrieved by my conclusions, shall desire a review, the appellate court may have before it my reasons in full, and be thus enabled the more readily to judge of their soundness or unsoundness. Decree for a division of damages.

For a full discussion of the question of speed, see The Free State [Case No. 5,090].

---

MILWAUKEE (HUNNEMAN v.). See Case No. 6,878.

MILWAUKEE & ST. P. R. CO. (BARNES v.). See Case No. 1,016.

MILWAUKEE & ST. P. R. CO. (BRIGHT v.). See Case No. 1,877.

MILWAUKEE & ST. P. R. CO. (DREW v.). See Case No. 4,079.

MILWAUKEE & ST. P. R. CO. (HOWARD v.). See Case No. 6,761.

MILWAUKEE & ST. P. R. CO. (KELLOGG v.). See Case No. 7,664.

MILWAUKEE & ST. P. R. CO. (MINNETT v.). See Case No. 9,636.

MILWAUKEE & ST. P. R. CO. (UNITED STATES v.). See Cases Nos. 15,778 and 15,779.